# United States Court of Appeals
## For the First Circuit

No. 12-1245

DOUGLAS O. NYSTEDT, JR., individually and as
Administrator of the Estate of Evan T. Nystedt,

Plaintiff, Appellant,

v.

EUGENE A. NIGRO ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

William P. Corbett, Jr., with whom The Corbett Law Firm was on
brief, for appellant.
Christopher R. Conroy, with whom Elizabeth A. Houlding and
Peabody & Arnold LLP were on brief, for appellees.

November 20, 2012

**SELYA, Circuit Judge.** This case requires us to explore the parameters of the doctrine of quasi-judicial immunity. The underlying litigation is a will contest turned conspiracy case. The plaintiff prevailed in probate court, but only after two and a half years of pretrial discovery and legal wrangling. All the while, the estate's assets waned and the legal fees waxed.

In the end, the plaintiff, although found to be the sole lawful heir of the decedent, had little to show for his victory. Seeking retribution, he sued a bevy of persons involved in the will contest. The central theme of his suit was the allegation of a wide-ranging conspiracy.

In a preliminary ruling, the district court found two of the defendants (a lawyer who had served as a court-appointed discovery master and the lawyer's firm) immune from suit by reason of quasi-judicial immunity. The court certified this ruling as a partial final judgment. See Fed. R. Civ. P. 54(b). After careful consideration, we affirm.

## I. BACKGROUND

"Because this case was decided below on a motion to dismiss, we rehearse the facts as revealed by the complaint and the documents annexed thereto." Katz v. Pershing, LLC, 672 F.3d 64, 69 (1st Cir. 2012).

This imbroglio began with the death of Evan Nystedt in May of 2004. Soon thereafter, the decedent's attorney and friend,

Earl Munroe, offered a purported will for probate. The probate court provisionally appointed Munroe as executor. See Mass. Gen. Laws ch. 192, §§ 13-14 (repealed 2008). Munroe neglected to provide the statutorily required notice to heirs, see id. § 13, and used his position as temporary executor to squander estate resources.

The decedent's closest living relative was plaintiff-appellant Douglas Nystedt, who eventually learned of the probate proceedings. He asserted his rights as heir at law and, in August of 2004, initiated a will contest.

On December 17, 2004, the probate court appointed Eugene Nigro, a practicing lawyer, as a special master "to monitor the discovery process" and ensure "full[] compl[iance] with [] reasonable [discovery] requests" "on a timely basis." The court authorized the special master to charge the parties, equally, his usual and customary hourly rates. See Mass. R. Civ. P. 53(c); Mass. R. Dom. Rel. P. 26(j).

The plaintiff alleges that the special master's performance left much to be desired. He asserts that the special master failed to respond to several letters imploring him to schedule a discovery conference and compel Munroe to honor discovery requests. He also asserts that the special master engaged in ex parte communications with Munroe's counsel, George Lordan. He laments that, after eighteen months of service, the

-3-

special master had only two depositions and one hundred pages of "generally irrelevant" documents to show for his efforts.

In May of 2006, the plaintiff sought to oust the special master. The probate court rejected this entreaty. Discovery continued until February of 2007, when trial commenced. Following the trial, the probate court, noting that Munroe was both the preparer of the will and the person who stood to inherit from it, disallowed the will. The rejection of the will left the plaintiff as the decedent's administrator and the sole beneficiary of the estate. Mass. Gen. Laws ch. 190, §§ 2-3 (repealed 2008). On appeal, the probate court's decision was affirmed. See Munroe v. Nystedt, No. 07-P-944, 2008 WL 4778297 (Mass. App. Ct. Nov. 4, 2008).

The plaintiff's success was bittersweet. By the time that he prevailed and took control of the assets, the value of the estate had been greatly diminished. To make matters worse, he had spent over $200,000 in waging the will contest.

Having been left holding a nearly empty bag, the plaintiff, individually and in his capacity as administrator of the decedent's estate, sued a phalanx of will-contest participants. These defendants included the special master and the law firm in which he was a partner, Nigro, Pettepit & Lucas, LLP (the Firm). For ease in exposition, we refer to these two defendants, collectively, as the Nigro defendants.

After his suit was docketed in the federal district court, the plaintiff twice amended his complaint. The operative pleading for present purposes — the second amended complaint — contains twenty-three counts against nine defendants.

The claims against the Nigro defendants are narrowly focused. The complaint posits that the special master's delinquent performance of his duties prolonged the will contest and, thus, caused the value of the estate to plummet. The plaintiff frames this plaint as both a racketeering conspiracy charge under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and a civil conspiracy charge under common law. In essence, he avers that the special master's misdeeds furthered a conspiracy crafted by Munroe and others. Viewed from that coign of vantage, the dispatch of each of the fifty-five invoices sent by the Nigro defendants was intended to "reap illicit[] benefits" from the conspiracy. These mailings ostensibly amounted to instances of mail fraud, which served as predicate acts for the racketeering charge. See 18 U.S.C. §§ 1341, 1962. The invoices and ex parte communications also allegedly abetted Munroe's unlawful conversion of estate assets.

The Nigro defendants moved to dismiss the claims against them on the basis of quasi-judicial immunity. Fed. R. Civ. P. 12(b)(6). The district court granted this motion by means of a docket entry because, in its view, all of the Nigro defendants'

-5-

actions "relate[d] to [Nigro's] quasi-judicial work as a discovery master."  The district court then certified its order of dismissal as a final judgment.  See Nystedt v. Munroe, No. 10-10754, 2012 WL 244939 (D. Mass. Jan. 26, 2012) (citing Fed. R. Civ. P. 54(b)). This timely appeal followed.

## II.  ANALYSIS

Before us, the plaintiff challenges both the certification order and the order of dismissal.  Without the certification, we would lack jurisdiction to entertain the appeal. See 28 U.S.C. § 1291; see also Feinstein v. Resolution Trust Corp., 942 F.2d 34, 39-40 (1st Cir. 1991).  Accordingly, we begin with the certification order and then mull the dismissal order.

### A.  **The Certification Order**.

"When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . ."  Fed. R. Civ. P. 54(b).  This procedure, though sometimes useful, is in obvious tension with the "long-settled and prudential policy against the scattershot disposition of litigation."  Spiegel v. Trs. of Tufts Coll., 843 F.2d 38, 42 (1st Cir. 1988).  "It follows, then, that entry of judgment under the rule should not be indulged as a matter of routine or as a magnanimous accommodation to lawyers or litigants."  Id.  Rather, Rule 54(b) should be applied sparingly and "only if the court

-6-

expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

When contemplating Rule 54(b) certification, a trial court first must ensure that the ruling underlying the proposed judgment is final. Spiegel, 843 F.2d at 42. Such a determination embodies a judgment about a matter of law and, thus, engenders de novo review. González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 317 (1st Cir. 2009). To qualify as final, a ruling must "dispose[] completely either of all claims against a given defendant or of some discrete substantive claim or set of claims against the defendants generally." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 580 (1st Cir. 1994). This requirement is plainly satisfied here: the order granting the Nigro defendants' Rule 12(b)(6) motion to dismiss terminated all of the plaintiff's claims against them.

The plaintiff attempts to parry this thrust. He argues that the dismissed claims against the Nigro defendants were part of counts in which other defendants were also named. With this in mind, he insists that the district court's order could not be "final" as the counts at issue remained in the case.

This argument exalts form over substance. A single count in a complaint may contain multiple claims and implicate multiple defendants. By its terms, Rule 54(b) permits the entry of a final judgment as to "one or more . . . parties," without reference to

the fact that the pleader may have organized such claim or claims within counts containing claims against other parties. See Feinstein, 942 F.2d at 39-40 (upholding Rule 54(b) certification of an order dismissing claims against some, but not all, defendants named in a single RICO count).

In addition to finality, Rule 54(b) requires the trial court to make an express determination that there is "no just reason for delay." We examine the district court's evaluation of the equities inherent in this determination with a deferential eye. See Spiegel, 843 F.2d at 43-44.

In the case at hand, the district court focused on the importance of protecting the Nigro defendants' reputation in the legal community. Nystedt, 2012 WL 244939, at *1. The court noted that pending RICO and conspiracy charges might well dissuade potential clients from using their services. Id. To cinch matters, the court found nothing to suggest that the immediate entry of a partial final judgment would prejudice the rights of any party. Id.

We discern no error. We think that the district court's assessment of the equities is reasonable, and that Rule 54(b) certification is appropriate in the circumstances of this case. We note, moreover, that the policy of the law favors the resolution of immunity defenses as early in a lawsuit as may be practicable. See, e.g., P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506

U.S. 139, 145 (1993); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). This factor, too, counsels in favor of immediate appellate review.

## B. **The Dismissal Order**.

The district court granted the motion to dismiss on the ground that Nigro, as a court-appointed discovery master, was entitled to absolute quasi-judicial immunity. We review this decision de novo. Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). "In conducting that review, we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011).

There is a wrinkle here that potentially affects our review. The plaintiff's complaint contains both federal and state claims. Where, as here, a federal court proceeds to adjudicate state-law claims under supplemental jurisdiction, it is obliged to apply state substantive law to those claims. Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010). As a result, we must apply federal law to some claims and state law to others. Here, however, this dichotomy is more apparent than real. There are only minute distinctions between the two bodies of immunity law, and no such distinction is implicated in this case. Consequently, we rely interchangeably on federal and state precedents with respect to the scope of quasi-judicial immunity.

-9-

The doctrine of quasi-judicial immunity provides absolute immunity for those who perform tasks that are inextricably intertwined with the judicial function. Cleavinger v. Saxner, 474 U.S. 193, 200 (1985); Coggeshall v. Mass. Bd. of Regis. of Psychologists, 604 F.3d 658, 662-63 (1st Cir. 2010); LaLonde v. Eissner, 539 N.E.2d 538, 540-41 (Mass. 1989). This doctrine is rooted in the wise idea that those who perform adjudicative functions "require a full exemption from liability." Butz v. Economou, 438 U.S. 478, 508 (1978).

Court-appointed discovery masters plainly perform judicial functions. Under accepted Massachusetts practice, they "control the extent of discovery, including the scheduling and oversight of depositions [and] the time for completion of discovery, and [they] resolve any discovery disputes which may arise during the course of the litigation." Mass. R. Dom. Rel. P. 26(j). During his performance of these duties, a master is "functionally indistinguishable from a trial judge." AccuSoft Corp. v. Palo, 237 F.3d 31, 58 (1st Cir. 2001) (alteration and internal quotation marks omitted). It follows inexorably, as night follows day, that court-appointed discovery masters, acting in that capacity, share a judge's immunity from suit. Cf. Brown v. Newberger, 291 F.3d 89, 94 (1st Cir. 2002) (discussing acts of court-appointed evaluators); Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1, 3 (1st Cir. 1976) (discussing acts of

-10-

court-appointed receiver).  This immunity makes perfect sense; in its absence, court-appointed discovery masters would become "lightning rod[s] for harassing litigation aimed at judicial orders."  Kermit Constr., 547 F.2d at 3.

The plaintiff acknowledges the general proposition that a court-appointed discovery master may be entitled to quasi-judicial immunity.  To avoid this dead end, however, he tries to invoke two recognized exceptions to the general proposition.  The first of these exceptions relates to non-judicial acts, see, e.g., Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993); Cok v. Cosentino, 876 F.2d 1, 3 (1st Cir. 1989); the second relates to acts, which, "though judicial in nature," are "taken in the complete absence of all jurisdiction," Mireles v. Waco, 502 U.S. 9, 11-12 (1991).  We examine these claims separately.

The plaintiff argues that the Nigro defendants' transmittal of invoices and the special master's ex parte communications with Lordan are non-judicial acts sufficient to trigger the first exception.  This argument rests on a misapprehension of the exception.

Judicial acts are those that are "intimately associated" with the judicial function.  Burns v. Reed, 500 U.S. 478, 486 (1991) (internal quotation marks omitted).  For this purpose, the judicial function has been defined as the adjudication of disputes between parties.  Antoine, 508 U.S. at 435.  Nigro's performance of

-11-

his duties as a court-appointed discovery master falls comfortably within this sphere.  This includes the sending of invoices for services rendered and the alleged ex parte communications — acts that were intimately associated with the adjudication of discovery disputes.

As to the invoices, they were sent in furtherance of the probate court's direction about how the special master should be paid and were an unremarkable vehicle for securing that compensation.  As to the communications, the plaintiff has not alleged — nor does the record in any way suggest — that they pertain to anything other than Nigro's work as a court-appointed discovery master.  Indeed, the probate court denied the motion to remove the special master, which was based on the same allegations of ex parte communications.  There is no reason to look behind that ruling.  In any event, a mere claim of ex parte contact, alleged to be in violation of Mass. Sup. Jud. Ct. R. 3:09, canon 3(B)(7), does not, without more, establish that the <u>nature</u> of the communication was not inextricably intertwined with the judicial function.  The fact that a court-appointed discovery master performs a judicial function in an imperfect (or even unethical) way does not, by itself, dissolve his quasi-judicial immunity.  <u>See</u> <u>Cok</u>, 876 F.2d at 3 (holding that "allegations of malice," "bad faith," or "conspiracy" will not circumvent absolute quasi-judicial immunity).

As a fallback position, the plaintiff avers that sending an invoice is an "administrative," rather than a "judicial" act. This averment suggests a false dichotomy. The administrative character of an act might make a difference if the act was not intimately associated with the performance of core judicial functions. See, e.g., Forrester v. White, 484 U.S. 219, 229 (1988) (holding discriminatory dismissal of court employee to be a non-judicial act). Here, however, the administrative act of sending invoices was integrally related to Nigro's work as a court-appointed discovery master and, therefore, the immunity attaches to the act. Cf. New Eng. Cleaning Servs., Inc. v. Am. Arbit. Ass'n, 199 F.3d 542, 545 (1st Cir. 1999) (holding that administrative tasks associated with processing a party's demand are arbitral acts for purposes of arbitral immunity).

The plaintiff's attempt to invoke the second exception — for actions taken in the absence of all jurisdiction — is equally unavailing. He bases this argument on a number of perceived procedural glitches, including the fact that the record does not indicate any "special reasons" sufficient to justify the appointment of a discovery master pursuant to former Mass. Prob. Ct. R. 20 (amended 2011); the fact that Nigro neither lived nor maintained an office in the county in which the probate court sat, as required by that rule; the fact that the special master's billings were in excess of the billings permitted by that rule; the

-13-

fact that the appointment was not temporally limited, as required by former Mass. Prob. Ct. R. 21 (amended 2011); and the fact that the special master's ex parte communications with Lordan were unethical.

We need not address these allegations item by item. Even if procedural irregularities of this sort existed, they would not strip Nigro of his jurisdiction to act as a court-appointed discovery master.[1] The Supreme Court has squarely held that absolute judicial immunity is ineffaceable even in the presence of "grave procedural errors." Stump v. Sparkman, 435 U.S. 349, 359 (1978); see also Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 357 (1871) (distinguishing the "validity of the act" from the question of whether judicial immunity attaches); New Eng. Cleaning Servs., 199 F.3d at 546 (similar). The errors here (if errors at all) were not grave and, in all events, fall within the prophylaxis afforded by Stump.

If more were needed — and we doubt that it is — there is an even more basic defect in the plaintiff's "absence of

---

[1] We do not mean to imply that the alleged procedural flaws were flaws at all. Although we need not (and do not) pass upon the question, it seems likely that the probate court was applying Mass. R. Dom. Rel. P. 26(j) rather than the probate court rules. See generally Mass. Supp. Prob. & Fam. Ct. R. 20 reporter's notes (2012) (noting that the 2011 amendment, which cross references the Massachusetts Rules of Domestic Relations Procedure, reflects the "usual practice" of the probate courts). The appointment at issue here appears to conform to the requirements of Mass. R. Dom. Rel. P. 26(j).

jurisdiction" argument. His claims amount to nothing more than claims of error that could, and should, have been addressed in the will contest itself. After all, "[w]ere collateral and retrospective attacks on technical defects of court appointments permitted, the court's work in an already difficult litigation field would often be undone, with consequent uncertainty, delay, and frustration." Brown, 291 F.3d at 94. The plaintiff could, for example, have brought the alleged procedural flaws to the attention of the probate court and, if that court denied relief, could have raised the points on appeal. After all, one of the primary purposes of judicial immunity is to "establish appellate procedures as the standard system for correcting judicial error." Forrester, 484 U.S. at 225.

Here, too, the plaintiff has a fallback position. He strives to persuade us that the special master acted in the complete absence of jurisdiction because his failure to respond to the plaintiff's letters anent discovery orders constituted an abandonment of his office (and, hence, his jurisdiction to act). We are not convinced.

The law is clear that even bad faith or malice will not divest the cloak of judicial immunity. See, e.g., Mireles, 502 U.S. at 11. A fortiori, negligence in performing judicial duties affects neither a defendant's immunity nor his jurisdiction; the judicial officer (or the person performing tasks intimately

associated with core judicial functions) retains the power, whether or not negligent, to act in that capacity. See Cok, 876 F.2d at 4 (holding that "negligent performance" or "dereliction of duty" does not divest an individual of authority granted by the court).

The plaintiff's final argument is that the Firm, as contrasted with Nigro himself, was not entitled to quasi-judicial immunity. In this regard, he points out that the Firm was not mentioned in the probate court's appointment order and had no standing in the will contest.

This is whistling past the graveyard. The Firm had no independent involvement in the will contest. From what the complaint reveals, the Firm's only contribution was through the special master's use of its resources (such as staff assistance, stationery, and the like). This kind of support for the performance of judicial acts warrants quasi-judicial immunity. See Lewittes v. Lobis, 164 F. App'x 97, 98 (2d Cir. 2006); Quitoriano v. Raff & Becker, LLP, 675 F. Supp. 2d 444, 449 (S.D.N.Y. 2009). In much the same way that a law clerk who helps in the formulation of an opinion is entitled to share in the judge's immunity, a law firm whose partner enjoys quasi-judicial immunity is entitled to share in that immunity for helping the partner to perform his judicial tasks. Cf. Bettencourt v. Bd. of Regis. in Med., 904 F.2d 772, 784-85 (1st Cir. 1990) (affirming grant of quasi-judicial immunity to legal adviser to a board performing judicial

functions).  Any other result would render illusory the important protections afforded by the doctrine of quasi-judicial immunity.

**III.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we affirm the district court's grant of dismissal.

**<u>Affirmed</u>**.